A BATES BUTLER III
177 North Church Ave., Suite 1013
Tucson, AZ  85701
Telephone:  (520) 624-6200
Facsimile:   (520) 624-6204
bates@abbutlerlaw.com

William B. Federman (*pro hac vice to be filed*)
**FEDERMAN & SHERWOOD**
2926 Maple Ave., Ste. 200
Dallas, TX 75201
Telephone: (214) 696-1100
Facsimile:  (214) 696-740-0112
wbf@federmanlaw.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| (1) WILLIAM MOYER,<br>individually and on behalf of all<br>others similarly situated,<br><br>       Plaintiff,<br><br>v.<br><br>(2) VOLKSWAGEN GROUP OF<br>AMERICA, INC.; and<br>(3) VOLKSWAGEN AG,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. _____<br><br>   **JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

COMES NOW Plaintiff William Moyer, individually and on behalf of all other similarly situated (*i.e.* the members of the Class described and defined within this Class Action Complaint), (hereafter, collectively, "Plaintiffs"), and for their causes of action against Defendant Volkswagen Group of America, Inc. and Volkswagen AG, (hereafter, collectively, "Defendants"), allege and state as follows:

### OVERVIEW

1

1.     This case addresses one of the most deliberate and blatant frauds to be perpetrated on the U.S. consumers by an international automotive conglomerate in history.  It arises from Defendants' stunning September 3, 2015, admission that, for more than seven (7) years, Defendants have been intentionally, deliberately, and maliciously designing, manufacturing, and distributing hundreds of thousands of its purportedly "clean diesel" vehicles with a software algorithm embedded in the engine control module, the sole purpose of which was to detect when a federally mandated emissions test was being conducted and to cause the vehicles' emissions system to switch to an operating mode that would enable the vehicle to falsely appear to pass the federal and state clean air emissions standards.  To be clear, the engine control module would command the emissions system to run in this mode ONLY when the engine control module determined that the vehicle was being operated under the testing conditions for the federally mandated emissions testing.  At all other times, the engine control module would command the emissions system to operate in such a way that the clean diesel vehicles would, in fact, emit up to forty-times (40x) the quantity of nitrogen oxides allowed by federal and state emissions standards. In so doing, Defendants introduced at least half a million automobiles into the United States market that flagrantly violate this country's Clean Air Act.

2.     The aim of the Clean Air Act and the corresponding regulations and state laws was to protect human health and the environment by reducing emissions of nitrogen oxides and other pollutants.  Nitrogen oxides are known to be a family of highly reactive gases that are significantly involved in atmospheric reactions with volatile organic compounds that produce ozone.  Breathing ozone has been linked to a variety of health problems including chest pain, coughing, throat irritation, and congestion, and can worsen health conditions such as bronchitis,

emphysema, and asthma. What is worse, children are at the greatest risk of experiencing negative health conditions from exposure to ozone.

3.     The impunity, avarice, and disregard for the law by Defendants Volkswagen Group of America, Inc. and Volkswagen AG, makes this story all the more remarkable.  Since its introduction in 2008, Defendants touted the 2.0L TDI Clean Diesel engine as a "fantastic power train" that "gives very good fuel economy" that "is also good for the environment because it puts 25% less greenhouse gas emissions than what a gasoline engine would, . . . cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%, . . . [and is] clean enough to be certified in all 50 states." (Statement of Volkswagen Group of America, Inc.'s Chief Operating Officer Mark Barnes, to The Business Insider, October 9, 2009.)  What Mr. Barnes neglected to say was that the VW clean diesel vehicles were engineered to be able to detect when they were being tested and to switch the manner in which the emissions system operated to be able to achieve those reductions in nitrogen oxides.  What Mr. Barnes also neglected to disclose was that, after circumventing the emissions laws of the United States, every one of VW's clean diesel vehicles' emissions systems were programmed to run in a mode that would result in up to 40 times the allowable quantities of nitrogen oxides being released into the atmosphere under normal every day operating conditions.

4.     Defendants used this fraud to allow them to position Volkswagen as the market leader in automotive diesel sales in the United States, capturing an astounding 78% of the market by 2013 according to its own documents.  And while it was perpetrating this fraud, it was taking shots at other automakers who were caught inflating the real-world mileage performance, as reflected in the statements of Volkswagen Group of America Inc.'s technical strategy manager, Doug Skorupski, who, in a September 14, 2013 press release, stated that "Volkswagen's sales of

TDI clean-diesel models may be benefitting from the increasing problems that other auto brands have encountered in elevating the real-world mileage performance of some of their cars with the fuel economy they advertise."

5.     But perhaps the most brazen display of its fraud had to be Volkswagen Group of America Inc.'s press release of August 23, 2013, titled "Volkswagen Group Presses for 'Green' Recognition for Clean Diesel," in which its vice president for industry and government relations complained that "We're not feeling the love," referring to the fact that diesel buyers had not been afforded favorable government treatment, and touting clean diesel as "one of the greatest choices" for car buyers with environmental concerns as well as fuel economy demands.

6.     Further evidencing Defendants' knowing commitment to their fraud, even when the first indication surfaced that Defendants' clean diesel cars were violating clean air emissions standards under real-world operating conditions in May 2014, and the EPA and CARB launched their investigations, Defendants vehemently denied any wrongdoing, manufactured "technical issues" to throw investigators off the trail, and even purported to develop a fix and announced a voluntary recall in December 2014 that they claimed would remedy the irregularities identified by the regulators.

7.     When federal and state regulators identified the purported voluntary recall as what it was, a sham fix, and threatened to withhold Certificates of Conformity for all future VW diesel automobiles, only then did Volkswagen Group of America, Inc. finally admit that, since the 2009 model year, it had been engineering its vehicles to be able to identify and circumvent federally mandated emissions testing. This from the same Company that on January 12, 2008 – immediately prior to the introduction of its 2.0L TDI clean diesel engine – issued the "Volkswagen Group Environmental Principles Products" in which the Chairman of the Board

defined the corporate objective of "climate protection" and "reduc[tion of] greenhouse gas emissions." Defendants have knowingly misled the U.S. consumer market for years. The Audi brand's slogan, one of the brands sold under Defendants umbrella organization, since 2007 has been:



8.      As the following will set forth, Defendants perpetrated this fraud on U.S. consumers, on federal and state regulators, and on the marketplace, but most to the point of this litigation, on Plaintiff Moyer and on the Class Members he seeks to represent, each of whom has purchased or leased a VW or Audi vehicle equipped with a 2.0L TDI Clean Diesel engine. Through this action, Plaintiff seeks to hold Defendants accountable.

### JURISDICTION AND VENUE

9.      This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiff and other putative class members are citizens of a different state than Defendants.

10.     This Court has personal jurisdiction over Plaintiff Moyer because he is an Arizona citizen, resides in Tucson, Arizona, and submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because Defendants have conducted and continue to conduct substantial business in the District; and because Defendants have committed the acts and

omissions complained of herein in the District, including the marketing and sale of a 2014 Volkswagen Jetta TDI vehicle to Plaintiff Moyer in the District.

11.     Venue as to Defendants is proper in this judicial district under 28 U.S.C § 1391 because Defendants sell a substantial amount of automobiles in this District, have dealerships in this District, advertise in this District, knowingly and purposely introduced their fraudulent statements to consumers who are citizens in this District and many of Defendants' acts complained of herein occurred within this District, including the marketing of a the Volkswagen Jetta TDI.

## PARTIES

**Plaintiff**

12.     Plaintiff Moyer is a citizen of the State of Arizona who resides in Tucson, Arizona.

13.     Plaintiff Moyer purchased a 2014 Volkswagen Jetta TDI vehicle in July, 2014, from Larry Miller Volkswagen in Tucson, Arizona.

**Defendants**

14.     Defendants are automobile design, manufacturing, distribution, and/or service corporations doing business within the United States.  Furthermore, Defendants design, develop, manufacture, distribute, market, sell, lease, warrant, service, advertise and repair passenger vehicles, including the Class Vehicles.

15.     Defendant Volkswagen Aktiengesellschaft, doing business as Volkswagen Group and/or Volkswagen AG (hereinafter, "VW AG"), is a corporation organized and existing under the laws of Germany, with its principal place of business located in Wolfsburg, Germany.  VW AG is the parent corporation of Volkswagen Group of America, Inc.

6

16.     Based on information and belief, Defendant Volkswagen Group of America, Inc., is a corporation which is incorporated in the state of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia.

17.     Defendant Volkswagen Group of America, Inc., owns and operates the Test Center California ("TCC"), located in Oxnard, California.  According to Defendant Volkswagen Group of America, Inc.'s 2013 Corporate Social Responsibility Report: "As the largest technical center of its kind for the Volkswagen Group outside of Germany, the TCC plays a pivotal role in the product development food chain, acting as the final stop for many products before they are approved for production.  Work at the TCC is focused on power train product development, governmental compliance and field quality testing.  The TCC has more than 50 engineers and technology experts working in a 65,500-square-foot LEED-certified facility."  Based on this, Plaintiffs believe that many of Defendants' acts complained of herein occurred within this District.

18.     Based on information and belief, Defendant Volkswagen of America, Inc., is a corporation which is incorporated in the state of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia, and is an operating unit of Volkswagen Group of America, Inc.

**FACTUAL ALLEGATIONS**

**The EPA and CARB Implementation of Higher Emissions Standards in 2009**

19.     In the United States, emissions standard are managed on a national level by the Environmental Protection Agency ("EPA"), while state and local governments may apply for waivers to enact stricter regulation.

20.     Two tiers of emissions standards were defined by the Clean Air Act Amendments of 1990.  The Tier I standard was adopted in 1991 and phased in from 1994 to 1997.  The Tier II standards were phased in from 2004 to 2009.  Within the Tier II standard, there are subgroups designated Bins 1-11, with Bin 1 being the cleanest (i.e. zero emission vehicles) and Bin 11 being the dirtiest.  Bin 5 sets forth the standards that apply to automobiles and light trucks.

21.     The Tier II, Bin 5 standards specifically restrict emissions of carbon monoxide ("CO"), nitrogen oxides (NOx), particulate matter (PM), formaldehyde (HCHO), and non-methane organic gases (NMOG) or non-methane hydrocarbons (NMHC).  The emissions limits are defined in the unit grams per mile (g/mi).

22.     Moreover the EPA has developed consumer ratings in the form of an "air pollution score" reflecting the amount of health-damaging and smog-forming airborne pollutants the vehicle emits from zero (most/worst) to 10 (least/best), and a "greenhouse gas score" reflecting the amount of greenhouse gases a vehicle will produce over its lifetime, based on typical consumer usage, from zero (most/worst) to ten (least/best).

23.     One of the factors considered in determining the air pollution score is the amount of nitrogen oxides emitted from the vehicle.

24.     One of the factors considered in determining the greenhouse gas score is the amount of nitrous oxide ($N_2O$) emissions from the vehicle.

25.     California has been granted a waiver from the EPA emissions standards and the California Air Resources Board ("CARB") has adopted stricter emissions standards through California's Low Emissions Vehicle ("LEV") program, defining six automotive emission standards which are stricter than the EPA's Tier regulations.  A number of states have adopted California's stricter emissions standards, including: Arizona, Connecticut, Maine, Maryland,

Massachusetts, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, as well as the District of Columbia (collectively, the "CARB states").

26.     Under the Clean Air Act, the EPA administers a certification program to ensure that every vehicle introduced into United States commerce satisfies the applicable emission standards.  Under this program, the EPA issues certificates of conformity ("COC") approving the introduction of vehicles into United States commerce.

27.     To obtain a COC, vehicle manufacturers must submit a COC application to the EPA for each test group of vehicles that it intends to enter into United States commerce.  The COC application must include, among other things, a list of all auxiliary emission control devices ("AECDs") installed on the vehicle.  40 C.F.R. § 86.1844-01(d)(11).  An AECD is "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system."  40 C.F.R. § 86.1803-01. If an AECD is included in any vehicle, the COC application must also include "a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and [a] rationale for why it is  21   not a defeat device."  40 C.F.R. § 86.1844-01(d)(11).

28.     A defeat device is an AECD "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless: 1) Such conditions are substantially included in the Federal emission test procedure; 2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; and 3) The AECD does not go beyond the requirements of engine starting; or 4) The AECD applies only for emergency 28 vehicles . . . ."  40 C.F.R. § 86.1803-01.

29.     Motor vehicles equipped with defeat devices cannot be certified to be in compliance with EPA regulations.  EPA, *Advisory Circular Number 24: Prohibition on use of Emission Control Defeat Device* (Dec. 11, 1972); *see also* 40 C.F.R. §§ 86.1809-01, 86-1809-10, 86-1809-12.

30.     Finally, "[v]ehicles are covered by a certificate of conformity only if they are in all material respects as described in the manufacturer's application for certification."  40 C.F.R. § 86-1848-10(c)(6).

### Defendants' Development of the TDI Clean Diesel Technology

31.     It was against the backdrop of the phase-in of the EPA's Tier II, Bin 5 standards and CARB's LEV program that in or about 2008, Defendants introduced the 2.0L TDI CR Engine, which they described as "the first of a new generation of dynamic and efficient diesel engines from Volkswagen."  "TDI" stands for "Turbocharged Direct Injected," referring to the fact that these engines are turbocharged and use fuel injectors to directly inject fuel into each cylinder.  Fuel injectors atomize fuel through a small nozzle under high pressure.  "CR" stands for the term "Common Rail," referring to the shared fuel high-pressure accumulator for all injectors in a cylinder bank.

32.     According to Defendants, "[t]he superior qualities of the 2.0 Liter TDI engine with common rail injection systems are oriented towards future challenges in acoustics, comfort, and exhaust gas after-treatment . . . confirming Volkswagen's role as a pioneer in diesel technology."

33.     Defendants further touted that "[t]he engine offers the potential for future improvements in exhaust gas standards and the associated technologies" and that "equipped with a special after-treatment system, this engine meets current emissions standards." This special

10

after-treatment system consisted of components including a diesel particulate filter with upstream oxidation catalyst and low and high pressure Exhaust Gas Recirculation ("EGR") system to reduce nitrous oxide emissions.

34. According to Defendants, "[t]he most effective measure to reduce nitrous oxides (NOx) with an internal combustion engine is by introducing very high exhaust gas recirculation rates into the combustion chamber."

35. Defendants claimed that in order to meet Bin 5 emission standards, "the entire operating characteristics of the engine up to full-load required EGR operation."

36. Defendants claimed that the "short path of the High-Pressure EGR is used in order to reach the desired EGR rate while driving at lower engine speeds and loads," but that "[w]ith rising engine load and engine RPM, the recirculation of exhaust gases is shifted to the Low Pressure EGR system to increase the recirculation rate . . . in order to obtain optimal NOx reduction at middle and high engine loads."



37.     The exhaust system of the 2.0L TDI CR engine consists of the following main components: 1) oxidation catalytic converter; 2) particulate filter; 3) nitrogen oxide filter; and 4) H2S catalytic converter.



38.     The oxidation catalyst is designed to convert a large portion of the hydrocarbons and carbon monoxide produced in the combustion process into water vapor and carbon dioxide.

39.     The diesel particulate filter consists of a honeycomb-shaped ceramic body made of aluminum titanide. As the soot-containing exhaust gas flows through the porous filter walls of the inlet channels, the soot particles are captured in the inlet channels and then later burned off (oxidized) during regeneration cycles.

40.     According to Defendants, a NOx storage catalyst is used to supplement the particulate filter system in order to meet the Tier II, Bin 5 emissions requirements.

41.     At the time of its introduction, the 2.0L TDI Clean Diesel utilized a Lean-NOx Trap technology (hereinafter referred to as "Gen 1"). Defendants later replaced the Gen 1 system with a Selective Catalytic Reduction ("SCR") technology (hereinafter referred to as "Gen 2").

42.     In August 2013, Defendants announced the introduction of the EA288 engine that would eventually replace the 2.0L TDI Clean Diesel. Defendants claimed that a "number of changes have been made to help reduce emissions, such as: use of a complex exhaust gas recirculation system (with high pressure EGR and a cooled low-pressure EGR); integration of the water-cooled intercooler and the EGR valve with the intake manifold, which also improves throttle response; and packaging the exhaust after-treatment components close to the engine by combining the DPF with the SCR Catalyst" (hereinafter referred to as "Gen 3").

### Defendants' Marketing of the TDI Clean Diesel Technology

43.     Beginning with the 2009 model year, Defendants began an aggressive marketing strategy to increase its market share of diesel powered vehicles in the United States by touting its "clean diesel" line of vehicles.

44.     In an October 2009 interview with Business Insider, when asked "[w]hat is the advantage of a diesel over a hybrid," VW of America's chief operating officer, Mark Barnes, stated:

> It's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would. **And thanks to the uniqueness of the TDI motor, it cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%. So, a very very clean running engine. Clean enough to be certified in all 50 states.**

Gayathri Vaidyanathan, "Volkswagen Preps for a Diesel Revolution," The Business Insider, Oct. 2009 (emphasis added).

45.     In that same interview, when asked "how do you re-brand something that's dirty like diesel as something that's green," Barnes stated:

> The way we've gone about it is through a number of communication pieces. One of them we've used is TDI Truth & Dare. It is a very good website that compares some older diesels versus the current TDI clean diesel. And one of the things we do is we put coffee filters over the exhaust pipes of both cars. We let them run for

13

five minutes and after they are done, we take them off and the older diesel product (not a VW diesel) has a round sooty spot on that coffee filter. Ours is very clean. In fact they actually make coffee out of the filter that was attached to the Volkswagen clean diesel tail pipe and they drink it.

*Id.*

46.     In an extremely effective effort to boost sales of its line of diesel vehicles, Defendants implemented aggressive national marketing campaigns to raise consumer awareness of what it purported to be its "TDI Clean Diesel Technology." One example of such marketing efforts was the following print advertisement:



47.     In another widely seen video advertisement aired by Defendants, three elderly ladies argue about whether diesel is dirty.



48.     After some bickering, one of the women puts her white scarf up against the exhaust pipe and then holds it up to face, proving that diesel is clean.





49.    Defendants' also emphasized the fuel efficiency of the TDI Clean Diesel along with its cleanliness. For example, in a marketing brochure for the 2013 VW Jetta TDI Clean Diesel, Defendants not only claimed that the car had a greater range on a single tank of gas than did the Toyota Prius, Mazda 3, Honda Civic HF, Ford Focus SE, and Toyota Corolla S, but they also claimed that it was "90% cleaner than previous diesel engines."



# More adventurous.

The very thought that the Jetta TDI can drive up to 609 miles on one tank is impressive all by itself.** But the fact that it's exceptionally fun to drive with its 236 lbs/ft of torque and turbocharged clean diesel engine is worth writing home about. Which is something you can do when you take it on long drives to faraway places. Like from Los Angeles to Napa Valley in time to hit the wineries when you get there. Or from Maryland to Maine, sampling every crab cake and lobster roll along the way. The fact that it's 90% cleaner than previous diesel engines might encourage you to get up and go more often than you expect, however. Your Jetta encourages spontaneity.

*Comparisons based on manufacturers' published data. 2012 2.0L Jetta TDI Clean Diesel, DSG automatic transmission: 30 city/42 highway mpg. Range based on 42 highway mpg EPA estimate and a 14.5-gallon tank. 2012 1.8L Toyota Prius, eCVT transmission: 51 city/48 highway mpg. Range based on 48 highway mpg EPA estimate and an 11.9-gallon tank. 2012 2.0L Mazda3 i Grand Touring with SKYACTIV-G, automatic transmission: 28 city/39 highway mpg. Range based on 39 highway mpg EPA estimate and a 14.5-gallon tank. 2012 1.8L Honda Civic HF, automatic transmission: 29 city/41 highway mpg. Range based on 41 highway mpg EPA estimate and a 13.2-gallon tank. 2012 2.0L Ford Focus SE with SFE Package, automatic transmission: 28 city/40 highway mpg. Range based on 40 highway mpg EPA estimate and a 12.4-gallon tank. 2012 1.8L Toyota Corolla, automatic transmission: 27 city/34 highway mpg. Range based on 34 highway mpg EPA estimate and a 13.2-gallon tank. All fuel values are EPA estimates. Your mileage will vary. **Range based on 42 highway mpg EPA estimate and a 14.5-gallon tank. Your mileage will vary.



## Jetta TDI Clean Diesel

50.    Defendants' also marketed the TDI Clean Diesel as "typically hav[ing] a higher resale value versus comparable gasoline vehicles," as it did in this 2015 Audi sales brochure:

17



51.     Defendants' Clean Diesel marketing campaign was, by all accounts spectacularly successful. Defendants' sales of TDI Clean Diesel vehicles rose from just 12,000 units in North America in 2008, to more than 100,000 units in 2013, constituting a 78% share of the North American diesel automobile market, selling more diesel cars in the United States than every other brand combined.



52.     The only problem is that it was all based upon a string of lies that started to unravel in 2014.

### The International Council for Clean Transportation/ University of West Virginia Study

53.     In early 2014, the Center for Alternative Fuels, Engines and Emissions ("CAFEE") at West Virginia University ("WVU") was contracted by the International Council on Clean Transportation to conduct in-use testing of three light-duty diesel vehicles, using a portable emissions measurement systems ("PEMS") over test routes in the state of California. These vehicles had all been certified as compliant with EPA Tier 2-Bin 5 and CARB LEV-II ULEV emission standards. In addition, two of the three vehicles were also selected for chassis dynamometer testing at CARB's El Monte, Facility. Gaseous emissions of nitrogen oxides, carbon monoxide, THC, and carbon dioxide were measured using the PEMS.

54.     Two of the test vehicles were a 2012 Volkswagen Jetta and a 2013 Volkswagen Passat equipped with a 2.0L TDI Clean Diesel engine, one with a Lean-NOx trap system and the other with a urea-based Selective Catalytic Reduction ("SCR") system.

55.     Based on their testing, the real world NOx emissions of the two Volkswagen vehicles were found to exceed the EPA Tier 2-Bin 5 standard by factors of 15 to 35 and 5 to 20, respectively. However, the NOx emissions for these same two vehicles were below the EPA Tier 2-Bin 5 standard during the chassis dynamometer testing.

## The EPA and CARB Investigations

56.     The EPA and CARB were alerted to the emissions problems with the Volkswagen test vehicle when WVU CAFEE published the results of its study on May 15, 2014. Both the EPA and CARB then opened investigations and begin discussions with Defendant Volkswagen Group of America, Inc. to determine the reason for the high NOx emissions measured under real world driving conditions in the WVU study.

57.     Over the course of the year following the publication of the WVU study, Defendant Volkswagen Group of America, Inc. initiated testing to replicate the WVU testing and identify the technical reasons for the high on-road emissions. During this time, Defendants continued to assert to CARB and the EPA that the increased emissions from these vehicles could be attributed to various technical issues and unexpected in-use conditions.

58.     In December 2014, Defendant Volkswagen Group of America, Inc. shared the results of its investigation with EPA and CARB and announced that it would conduct a voluntary software recall to recalibrate both the Lean-NOx Trap and the SCR systems. Volkswagen Group of America, Inc. asserted that the recall would include approximately 500,000 vehicles (approximately 50,000 of which were in California) and would fix, among other things, the real world driving emissions.

59.     Both the EPA and CARB agreed that Volkswagen Group of America, Inc. could implement this recall, but cautioned that they would perform confirmatory testing to ensure that the recall adequately addressed the issue.

60.     CARB, in coordination with the EPA, began confirmatory testing to determine the efficacy of the recall, including both in the laboratory on required certification cycles and over-the-road using PEMS. The over-the-road testing revealed the recall calibration did reduce emissions to some degree, but that NOx emissions were still significantly higher than expected.

61.     CARB then broadened its testing to pinpoint the exact technical nature of the test vehicles' poor performances, and to investigate why the onboard diagnostic system was not detecting the increased emissions. To do this, CARB developed a special dynamometer cycle consisting of driving the phase 2 portion of the FTP repeatedly. This special cycle revealed that NOx emissions would rise throughout the cycle, resulting in uncontrolled NOx emissions.

62.     CARB shared its findings with the EPA and Volkswagen Group of America, Inc. on July 8, 2015, and conducted several technical meetings with Volkswagen Group of America, Inc. The EPA and CARB concluded that none of the potential technical issues suggested by Volkswagen Group of America, Inc. explained the higher test results consistently confirmed during CARB's testing.

**VW Group of America's Stunning Admission**

63.     Given the results of CARB's post-recall confirmatory testing and Defendant Volkswagen Group of America, Inc.'s inability to explain why it's TDI Clean Diesel engines were emitting nitrogen oxides in excess of the EPA's Tier 2-Bin 5 and CARB's LEV-II standards, the EPA and CARB made it clear that they would not approve certificates of conformity for Defendants' 2016 model year diesel vehicles until Volkswagen Group of

America, Inc. could adequately explain the anomalous emissions and ensure the agencies that the 2016 model year vehicle would not have similar issues.

64.    Only when confronted with the threat that Defendants' 2016 model year diesel vehicles would not be issued certificates of conformity, did Volkswagen Group of America, Inc. admit to EPA and CARB officials that from 2009 through 2015 it had designed, manufactured, and installed a defeat device for the purpose of bypassing, defeating, or rendering inoperative elements of its diesel vehicles' emission control system.

65.    Specifically, this defeat device was a software algorithm installed in the engine control module (ECM) that was designed to sense when the vehicle was being tested for compliance with EPA emissions standards, based on various inputs, including the position of the steering wheel, vehicle speed, the duration of the engine's operation, and barometric pressure. These inputs directly tracked the federal test procedure used for emission testing for EPA certification purposes.

66.    When the software algorithm detected that EPA emission testing was being conducted, the ECM ran software which produced compliant emission results under an ECM calibration that Defendants refer to as the "dyno calibration." The term "dyno" refers to the equipment used in EPA emissions testing called a dynamometer. At all other times during normal vehicle operation, the software algorithm an ECM calibration that Defendants referred to as "road calibration" which reduced the effectiveness of the emission control system, specifically the Gen 1, Gen 2, and Gen 3 NOx converter technologies. As a result, emissions of NOx increased by a factor of 10 to 40 times above the EPA and CARB compliant levels, under real-world operating conditions.

67. The Clean Air act makes it illegal "for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter." 42 U.S.C. § 7522(A)(3)(B); 40 C.F.R. § 86.1854-12(a)(3)(ii).

68. Based on information and belief, Plaintiff alleges that Defendants knowingly and willfully installed a defeat device in the Class Vehicles in order to be able to market and sell such vehicles as having greater fuel efficiency and/or performance than would be possible if the Class Vehicles complied with EPA and CARB standards.

69. Based on information and belief, Plaintiff alleges that Defendants knowingly and willfully sold the Class Vehicles knowing such vehicles did not comply with EPA and CARB emissions regulations and that if such vehicles were designed and manufactured to comply with such emissions regulations, they would not have the fuel efficiency and performance characteristics that Defendants marketed and represented them to have.

70. As a result of their investigations and Volkswagen Group of America, Inc.'s admissions, both the EPA and CARB issued Notices of Violation to Volkswagen Group of America, Inc. finding that it violated "42 U.S.C. § 7522(a)(1), each time it sold, offered for sale, introduced into commerce, delivered for introduction into commerce, or imported (or caused any of the foregoing with respect to) one of the hundreds of thousands of new motor vehicles within [the designated] test groups." Additionally, they found Volkswagen Group of America, Inc. to have violated 42 U.S.C. § 7522(a)(3)(B) each time it manufactured and installed into these vehicles an ECM equipped with a defeat device.

23

71.     The Notices of Violation applied to the following vehicles equipped with the 2.0L

TDI clean diesel engine (hereinafter referred to as the "Class Vehicles"):

| Model Year | Make and Model(s) |
| --- | --- |
| 2009 | VW Jetta, VW Jetta Sportwagen |
| 2010 | VW Jetta, VW Jetta Sportwagen |
| 2011 | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2012 | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3, VW Passat |
| 2013 | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3, VW Passat |
| 2014 | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3, VW Passat |
| 2015 | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3, VW Passat |

**Plaintiff's Purchase of a 2014 Volkswagen Jetta TDI**

72.     Plaintiff Moyer purchased a 2014 Volkswagen Jetta TDI in July, 2014, from

Larry Miller Volkswagen in Tucson, Arizona.

73.     Plaintiff conducted research prior to making her decision to purchase the Jetta

TDI. Plaintiff observed numerous advertisements, marketing brochures and website pages, car

magazine articles, and dealer statements touting the TDI clean diesel as having great

performance and fuel efficiency with the impressive vehicle specifications represented, while

also being one of the most environmentally clean vehicles available in the market. These were

significant factors in Plaintiff making his decision to purchase the Jetta TDI.

74.     At no time prior to or after Plaintiff's purchase of the 2014 Volkswagen Jetta TDI

did Defendants inform Plaintiff that his vehicle had been designed and manufactured with a

defeat device that caused the vehicle to emit up to 40 times the quantity of nitrogen oxides

allowed by federal clean air standards when operated under normal driving conditions.

24

75.     At no time prior to or after Plaintiff's purchase of the 2014 Volkswagen Jetta TDI did Defendants inform Plaintiff that his vehicle would not possess performance and/or fuel efficiency characteristics it was represented to have if it were to comply with federal clean air standards.

76.     If he had been informed that the 2014 Volkswagen Jetta TDI clean diesel was equipped with a defeat device that caused it to emit up to 40 times the amount of nitrogen oxides permitted by the federal clean air standards, he would not have purchased this vehicle or would not have paid the amount he did for it.

### Defendants' Express Warranties

77.     In connection with the sale (by purchase or lease) of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty, ("NVLW"), on each vehicle for a period of 3 years or 36,000 miles, whichever occurs first.  The NVLW "covers any repair to correct a manufacturing defect in materials or workmanship."

78.     In addition, Defendants expressly warranted its vehicles through a Federal Emissions Control System Defect Warranty, ("FECSDW"), in which Defendants warranted for a period of 2 years or 24,000 miles to "every purchaser or lessee":

> that every **model year 2014** Volkswagen vehicle imported by Volkswagen:
> •      was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> •      is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations . . .

79.     Defendants also expressly warranted for a period of 8 years or 80,000, whichever occurs first, that a Volkswagen dealer will repair or replace free of charge the following major emission control components only:

> •      Catalytic Converter and Particulate Filter

- Engine Electronic Control Module
- On Board Diagnostic Device

80.     Defendants also provided a Federal Emissions Performance Warranty that provides that:

> if the following conditions are met, any authorized Volkswagen dealer in the United States, including its territories, will remedy any nonconformity, as determined below, free of charge, under the following circumstances:
> - The vehicle fails to conform to at any time during 24 months or 24,000 miles, whichever occurs first, to applicable emission inspection standards as determined by an EPA Approved State Inspection and Maintenance test or inspection, or
> - if the vehicle has been in use for more than 24 months or 24,000 miles, whichever occurs first, the vehicle fails an Inspection and Maintenance test or inspection resulting from a malfunction of a catalytic converter, particulate filter, engine electronic control module or on board diagnostic device (OBD), and
> - the failure of the Inspection and Maintenance test of inspection requires the vehicle owner to bear any penalty or other sanction, including the denial of the right to use the vehicle under local, state, or federal law . . . .

81.     Based on information and belief, Plaintiff further alleges that the relevant terms of the warranties in this case are identical, regardless of the model year of the Class Vehicles and that the relevant warranties are transferrable to subsequent owners of the vehicle.

82.     Plaintiff and the Class Members experienced defects within the warranty period. However, despite the existence of the express warranties provided to Plaintiff and Class Members, Defendants failed to inform Plaintiff and the Class Members that the Class Vehicles had been intentionally and knowingly designed and manufactured to be out of compliance with all applicable federal and state clean air standards and by failing to fix the defective emissions components free of charge.

## TOLLING OF THE STATUTE OF LIMITATIONS

83.     Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein. Plaintiff and proposed class members

26

could not have reasonably discovered the true, defective nature of the proposed Class Vehicles until shortly before this litigation commenced. Defendants are further estopped from relying on any statute of limitation because of their concealment of the defective nature of the Class Vehicles and their engines.

## CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following class:

> All persons or entities in the United States who own or lease a Volkswagen or Audi vehicle equipped with a 2.0L TDI Clean Diesel engine (the "Nationwide Class").

85.     Alternatively, Plaintiff proposes the following state-specific sub-class:

> All persons or entities who reside in the state of Arizona that own or lease a Volkswagen or Audi vehicle equipped with a 2.0L TDI Clean Diesel engine (the "Arizona Class").

86.     Excluded from the above class are Defendants, its employees, coconspirators, officers, directors, legal representatives, heirs, successors and wholly or partly own subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

87.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

88.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

89.     **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The members of the Class are so numerous that their individual joinder is impracticable.  Plaintiff is informed and believes that there are hundreds of thousands purchasers in the class.  Inasmuch as the class members may be identified through business records regularly maintained by Defendants and their employees and agents, and through the media, the number and identities of class members can be ascertained. Members of the Class can be notified of the pending action by e-mail, mail, and supplemented by published notice, if necessary.

90.     **Commonality and Predominance (Federal Rule of Civil Procedure 23(a)(2))** – There are questions of law and fact common to the Class. These questions predominate over any questions affecting only individual class members. These common legal and factual issues include, but are not limited to:

a.     Whether Defendants engaged in the conduct alleged herein;

b.     Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c.     Whether Defendants designed, manufactured, marketed, distributed, leased, sold or otherwise placed Class Vehicles into the stream of commerce in the United States knowing that the Class Vehicles did not comply with applicable federal and state emissions standards;

d.     Whether Defendants designed and manufactured the Class Vehicles with a defeat device;

e.     Whether Defendants designed and manufactured the Class Vehicles with a defeat device for the purpose of circumventing federal and state emissions requirements in order to represent that the Class Vehicles had greater performance and fuel economy characteristics than could otherwise have been achieved if in compliance with such emissions standards;

f.     Whether Defendants knew or should have known that the defeat device violated the Clean Air Act;

g.     Whether Defendants intentionally concealed from consumers that the Class Vehicles did not comply with federal and state emissions standards;

h.     Whether Defendants misrepresented to purchasers and lessees of the Class Vehicles that such vehicles were in compliance with federal and state emissions standards;

i.     Whether Defendants breached the express terms of its contracts with purchasers and lessees when it included a defeat device in the ECM of the Class Vehicles;

j.      Whether Defendants breached the covenant of good faith and fair dealing by including a defeat device in the ECM of the Class Vehicles;

k.      Whether Defendants willfully concealed from purchasers and lessees of the Class Vehicles that it designed and manufactured an illegal defeat device in the Class Vehicles;

l.      Whether Plaintiff and the other Class members overpaid for their Class Vehicles as a result of the defects alleged herein;

m.     Whether Plaintiff and the other Class members have been harmed by a diminution in value as a result of the defects alleged herein;

n.      Whether Defendants were unjustly enriched by their deceptive practices;

o.      Whether Plaintiff and members of the class are entitled to equitable or injunctive relief and, if so, in what amount.

91.     **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – The claims of the representative Plaintiff are typical of the claims of each member of the Class. Plaintiff, like all other members of the Class, has sustained damages arising from Defendants' violations of the laws, as alleged herein. The representative Plaintiff and the members of the Class were and are similarly or identically harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in by Defendants.

92.     **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – The representative Plaintiff will fairly and adequately represent and protect the interests of the Class members and has retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation. There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of all Class members.

93.     **Superiority (Federal Rule of Civil Procedure 23(b)(3))** – This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3), because questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual class members are

small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' conduct. Further, it would be virtually impossible for the members of the Class to individually redress effectively the wrongs done to them. Even if Class members themselves could afford such individual litigation, the court system could not. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

94.     The Class Plaintiff contemplates the eventual issuance of notice to the proposed Class members setting forth the subject and nature of the instant action. Upon information and belief, Defendants' own business records and electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, the Class Plaintiff would contemplate the use of additional media and/or mailings.

95.     This action is properly maintained as a Class Action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

a.     Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

    i.     Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

    ii.     Adjudication with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members

not parties to the adjudication or substantially impair or impede their ability to protect their interests;

b.     The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole; or

c.     Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a Class Action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

   i.     The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

   ii.    The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

   iii.   The desirability or undesirability of concentrating the litigation of the claims in the particular forum;

   iv.    The difficulties likely to be encountered in the management of a Class Action.

## CAUSES OF ACTION

96.    Plaintiff alleges the following causes of action on behalf of the Nationwide Class and all state-specific Classes, except where otherwise specifically noted

### COUNT I

### VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT
### (Ariz. R.S. § 44-1521 et seq.)

### (On behalf of the Arizona Sub-Class)

97.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein

98.    Plaintiff brings this claim on behalf of himself and on behalf of the members of the California Sub-Class.

31

99.     The Arizona Consumer Fraud Act provides: "The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  Ariz. R.S. § 44-1522.

100.    Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, including statements on the vehicle Monroney sticker and in nationally distributed print and video advertisements that the Class Vehicles were "clean diesel." Defendants also caused to be made or disseminated through Arizona and the United States, through its USA Warranty and Maintenance booklet, the misrepresentation that the Class Vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and [are] free from defects in material and workmanship which causes the vehicle(s) to fail to conform with EPA regulations." These statements were known, or which by the exercise of reasonable care should have been known, to Defendants to be untrue and misleading to consumers, including Plaintiff and the other Class Members.

101.    Defendants have violated § 44-1522 because the misrepresentations and omissions regarding the safety, reliability, and functionality of their Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

102.    Plaintiff and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive

practices. In purchasing or leasing their Class Vehicles, Plaintiff and the other Class Members relied on the misrepresentations and/or omissions of Defendants with respect to the safety, reliability, and performance and fuel economy characteristics of the Class Vehicles. Defendants' representations were not to be true because the Class Vehicles were designed, manufactured, and distributed with a defeat device, the sole purpose of which was to circumvent federal and state emissions standards. Had Plaintiff and the other Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them. Accordingly, Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

103.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

104.   Plaintiff, individually and on behalf of the other Class Members, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the other Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT II

### VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

### (On behalf of the Nationwide Class or, Alternatively,
### the Arizona Sub-Class)

105.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

106.    Plaintiff brings this claim on behalf of himself and on behalf of the members of the Nationwide Class or, alternatively, the Arizona Sub-Class.

107.    Plaintiff and the Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

108.    Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

109.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

110.    Title 15, United States Code, section 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

111.    Defendants' express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

112.    Defendants breached these warranties as described in more detail above. The Class Vehicles are equipped with the 2.0L TDI clean diesel engine. The Class Vehicles share a common defect in that they were designed and manufactured with a defeat device such that they are not in compliance with the Clean Air Act and cannot meet state and federal emissions standards under normal driving conditions.

113.    Plaintiff and the other Class Members have had sufficient direct dealings with either Defendants or their agents (dealerships and technical support) to establish privity of

contract between Defendants, on one hand, and Plaintiff and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Defendants' and its dealers, and specifically, of Defendants' express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

114.   Affording Defendants a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Defendants have engaged in a more than 7-year endeavor to knowingly conceal the fact that is designed and manufactured into the Class Vehicles a defeat device for the sole purpose of circumventing state and federal emissions standards. At the time of sale or lease of each Class Vehicle, Defendants knew, should have known, or were reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

115.   Plaintiff and the other Class Members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Class members have not re-accepted their Class Vehicles by retaining them.

116.   The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

117.   Plaintiff, individually and on behalf of the other Class members, seeks all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

## COUNT III

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(Arizona Commercial Code, Ariz. R.S. §§ 47-2314, 47-2318)**

**(On Behalf of the Arizona Sub-Class)**

118.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

119.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the Arizona Sub-Class.

120.   Defendants are and were at all relevant times 'merchants' under the Arizona Commercial Code.

121.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to the Arizona Commercial Code, Ariz. R.S. § 47-2314.

122.   These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles were defective in that they were equipped with a defeat device, the sole purpose of which was to circumvent federal and state emissions standards.

123.   Defendants were fully aware of this issue, as evidenced by the fact that on September 3, 2015, it admitted to EPA and CARB officials the existence of the defeat device when threatened with the withholding of Certificates of Conformity for its 2016 model year diesel vehicles.

124.   Plaintiff and the other Class members have had sufficient direct dealings with either Defendants or its agents (dealerships) to establish privity of contract between Plaintiff and the other Class Members. Notwithstanding this, privity is not required in this case because Plaintiff and the other Class Members are intended third-party beneficiaries of contracts between Defendants and its dealers; specifically, they are the intended beneficiaries of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiff's and the other Class Members' Class Vehicles are dangerous instrumentalities due to the aforementioned defects.

125.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiff and the other Class Members have been damaged in an amount to be proven at trial.

## COUNT IV

## BREACH OF CONTRACT/COMMON LAW WARRANTY

### (On Behalf of the Arizona Sub-Class)

126.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

127.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the Arizona Sub-Class.

128.   To the extent Defendants' limited remedies are deemed not to be warranties under Arizona's Commercial Code, Plaintiff, individually and on behalf of the other Class Members, pleads in the alternative under common law warranty and contract law. Defendants limited the remedies available to Plaintiff and the other Class Members to repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Defendants and/or warranted the quality or nature of those services to Plaintiff and the other Class Members.

129.   Defendants breached this warranty or contract obligation by failing to repair or replace the Class Vehicles' defective emissions systems.

130.   The material terms of the contract also included the implied covenant of good faith and fair dealing, whereby Defendants covenanted that they would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class Member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contract.

131.   Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract

132.   Defendants breached the contract and the implied covenant of good faith and fair dealing by, inter alia, equipping the Class Vehicles with defective emissions standards that were not in compliance with federal and state emissions standards.

133.   As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiff and the other Class Members have been damaged in an amount to be

proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT IV

## FRAUDULENT CONCEALMENT

### (On behalf of the Nationwide Class or, Alternatively, the Arizona Sub-Class)

134.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

135.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the Nationwide Class or, alternatively, the Arizona Sub-Class.

136.   The misrepresentations, nondisclosure, and/or concealment of material facts made by Defendants to Plaintiff and the members of the Class, as set forth above, were known, or through reasonable care should have been known, by Defendants to be false and material and were intended by Defendants to mislead Plaintiff and the members of the Class.

137.   Defendants had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed their Class Vehicles as possessing certain performance and fuel economy characteristics and as being in compliance with all applicable federal and state emissions standards. Defendants marketed the Class Vehicles as being "clean diesel." Once Defendants made representations to the public about safety, quality, functionality, and reliability, as well as about the performance and fuel economy characteristics of the "clean diesel" vehicles in particular, Defendants were under a duty to disclose these omitted facts,

because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

138.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants which had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff and the other Class Members. These concealed and omitted facts were material because they directly impact the safety, quality, functionality, reliability, and value of the Class Vehicles.

139.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the other Class Members to purchase or lease Class Vehicles at a higher price for the Class Vehicles, which did not match the Class Vehicles' true value.

140.   Plaintiff and the Class Members were unaware of these omitted material facts that were actively concealed and/or suppressed, in whole or in part, by Defendants with the intent to induce Plaintiff and the other Class Members to purchase or lease the Class Vehicles at a higher price for the Class Vehicles, which did not match the Class Vehicles' true value.

141.   If Plaintiff and other Class Members had known these material facts, they would not have acted as they did. Plaintiff's and the other Class Members' actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or the Class Members.

142.   As a result of the conduct of Defendants, Plaintiff and the Class Members have been damaged because the value of Plaintiff's and the Class Members' Class Vehicles have

diminished as a result of Defendants' fraudulent concealment of its scheme to circumvent federal and state emissions standards, which has harmed the Volkswagen and Audi brand names associated with the Class Vehicles.

143.   Furthermore, based on information and belief, Plaintiff anticipates that if and when Defendants are compelled to bring the Class Vehicles into compliance with state and federal emissions standards, as indicated by the Notices of Violations issued by the EPA and CARB, the Class Vehicles will no longer possess the performance and/or fuel economy characteristics they were represented to possess at the time of sale or lease.

144.   Accordingly, Defendants are liable to Plaintiff and the Class Members for damages in an amount to be proven at trial. In addition to such damages, Plaintiff seeks punitive or exemplary damages so as to punish Defendants and deter others.

145.   Defendants wantonly, maliciously, oppressively deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class Members' rights engaged in a systematic and intentional scheme to defraud consumers and state and federal regulators by circumventing the laws of the United States, the State of Arizona, and other states, by designing a defeat device in the form of a software algorithm whose sole purpose was to make it appear that the Class Vehicles complied with federal and state emissions standards when, in fact, they exceeded such standards by as much as 40 times. In perpetrating this scheme, Defendants were able to secure a 78% share of the automotive diesel market in the United States by representing their "clean diesel" vehicles to have performance and fuel economy characteristics that would not be possible if the Class Vehicles complied with federal and state emissions standards, not to mention taking market share away from cleaner burning hybrid and gasoline combustion cars by this fraud.

146.     Based on information and belief, Plaintiff alleges that Defendants engaged in a course of conduct to ensure that employees, dealers, and agents did not reveal this scheme to regulators or consumers in order to facilitate its fraudulent scheme and enhance Defendants' reputation and that of the Class Vehicles in order to sell more vehicles and to sell those vehicles at an inflated price.

147.     Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**PRAYER FOR RELIEF**

148.     WHEREFORE, Plaintiff and the Class pray for judgment as follows:

a.   For an order certifying this action as a class action;

b.   for an order appointing Plaintiff as representative of the Class and his counsel of record as Class counsel;

c.   for an award of actual, general, special, incidental, statutory, compensatory and consequential damages on claims for constructive fraud, breach of express and implied warranties under all relevant statutes or common law, and/or deceit in an amount to be proven at trial;

d.   for an award of exemplary and punitive damages in an amount to be proven at trial;

e.   for an order requiring Defendants to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

f.   for an order enjoining the wrongful conduct alleged herein;

g.   for costs;

h.  for interest;

i.   for attorneys' fees under applicable law; and

j.   for such other relief as the Court deems just and proper.

DATED:  September 30, 2015                  Respectfully submitted,


/s/A. Bates Butler III
A.  Bates Butler III
177 North Church Ave., Suite 1013
Tucson, AZ  85701
Telephone:  (520) 624-6200
Facsimile:   (520) 624-6204
bates@abbutlerlaw.com

/s/William B. Federman
William B. Federman (*pro hac vice to be filed*)
**FEDERMAN & SHERWOOD**
2926 Maple Ave., Ste. 200
Dallas, TX 75201
Telephone: (214) 696-1100
Facsimile:  (214) 696-740-0112
wbf@federmanlaw.com


*Attorneys for Plaintiff Moyer and the
Proposed Class*

ATTORNEY LIEN CLAIM
JURY TRIAL DEMANDED